Jeffrey DOUGLAS, a minor, by his father and next friend, Paul DOUGLAS; Paul Douglas, individually, and Jeannette Douglas, individually, Plaintiffs–Appellants,

v.

HUGH A. STALLINGS, M.D., INC., an Indiana Medical Corporation; Mary M. Stallings, as Personal Representative of the Estate of Hugh A. Stallings, M.D., and St. Mary's Medical Center, Defendants–Appellees.

No. 88–1564.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 9, 1988.
Decided March 13, 1989.

Philip J. Nathanson, Nathanson & Wray, Chicago, Ill., for plaintiffs-appellants.

Robert H. Hahn, Bamberger Foreman Oswald & Hahn, Evansville, Ind., for defendants-appellees.

Before CUMMINGS, COFFEY and MANION, Circuit Judges.

CUMMINGS, Circuit Judge.

This diversity action was brought by Paul and Jeannette Douglas, the parents of Jeffrey Douglas, both individually and on his behalf, against the estate and professional corporation of Hugh A. Stallings, M.D., and St. Mary's Medical Center. Defendants were residents of Indiana at the time of Jeffrey's birth on January 21, 1968, in Evansville, Indiana. Plaintiffs, Illinois citizens, allege that Jeffrey suffered irreversible brain damage as a result of defendants' negligent treatment of Jeffrey and his mother during his birth. As a result of the brain damage, Jeffrey is deaf, unable to speak, and afflicted by athetoid cerebral palsy.

Defendants have raised in defense the expiration of the Indiana statute of limitations contained in the Indiana Medical Malpractice Act of 1975, Ind.Code § 16–9.5–1–1 et seq. (1976) (the Act). Plaintiffs contend that the statute of limitations contained in the Act violates the equal protection and due process clauses of the Fourteenth Amendment to the Constitution and so does not bar this suit.

The district court found that the plaintiffs' action was time-barred by the statute of limitations and that it was constitutional under the reasoning of the Indiana Supreme Court in *Johnson v. St. Vincent Hospital, Inc.*, 273 Ind. 374, 404 N.E.2d 585 (1980). Therefore summary judgment was entered for defendants. We affirm.

I. Description of Malpractice Statute of Limitations

Plaintiffs Paul and Jeannette, then living in Evansville, Indiana, were expecting their second child, Jeffrey, in the spring of 1967. Throughout her pregnancy and delivery of Jeffrey, Jeannette was under the treatment of defendant Hugh Stallings, M.D., formerly a citizen of Indiana. Plaintiffs allege that Dr. Stallings was negligent in failing to perform blood tests and other medical procedures available at the time of Jeffrey's birth to determine the potential for the hemolytic disease which resulted in his irreversible brain damage. As a result of his injury, Jeffrey is permanently dependent on others for his care. Plaintiffs further assert that Dr. Stallings concealed information from Jeffrey's parents regarding the existence of appropriate procedures which would have prevented the injury to Jeffrey, leading them to believe his injuries were unavoidable. Jeffrey's parents claim to have been unaware of Dr. Stallings' failure to perform these procedures until immediately prior to filing this action on March 7, 1984.

As did many other states, Indiana enacted special legislation in response to the nationwide medical malpractice crisis occurring in the 1970's. During that period, health insurance carriers became concerned with their ability to provide coverage to health care providers in light of the unpredictability and magnitude of malpractice awards. Indiana's malpractice legislation was structured to provide insurance carriers with an increased ability to estimate their potential liability and to ensure stable, continued coverage to health care providers in the interest of preserving affordable health care services. The Act was structured to accomplish these goals by modifying the procedural framework in the following ways: (1) limiting the amount of damages recoverable to $500,000 per injury or death (Ind.Code § 16–9.5–2–2 (1976)); (2) reducing the age of disability for minors from eighteen to six years (Ind.Code § 16–9.5–3–1 (1976)); (3) keying the commencement of the statute of limitations to the occurrence, rather than the discovery,

of the injury (Ind.Code § 16–9.5–3–1 (1976)); and (4) establishing a mandatory review panel to expedite and screen malpractice claims on the basis of merit as a prerequisite to proceeding in court. The Act was sustained against an exhaustive constitutional challenge in *Johnson v. St. Vincent Hospital, Inc.*, 404 N.E.2d 585.[1] In this Court, plaintiffs challenge only the validity of the statute of limitations contained in the Act.

The statute of limitations provides that any action against a health care provider covered by the Act[2] based upon the health care rendered must be brought within two years from the date of the act, omission or neglect which forms the basis for suit. Ind.Code § 16–9.5–3–1 (1976).[3] If the injury occurs to a minor under the age of six, the action may be commenced any time before the child's eighth birthday. For injuries occurring before the effective date of the Act, July 1, 1975, the action may be brought within the longer of: (1) two years following the effective date of the Act or (2) for an injury occurring to a victim under the age of six years, before the child's eighth birthday. Ind.Code § 16–9.5–1–7 (1976).

The malpractice statute of limitations applies to all persons regardless of minority or other legal disability.[4] Since Jeffrey was seven years old at the effective date of the Act, the statute allowed him until July 1, 1977, to file this action. At the time plaintiffs filed this action on March 7, 1984, Jeffrey was sixteen years old.

The general statute of limitations for other personal injuries also allows the injured party two years from the injury to bring the action. However, in contrast to the malpractice statute of limitations, the general personal injury statute of limitations is subject to a general tolling period based on legal disability. Section 34–1–2–5 of the Indiana Code provides that any person under a legal disability when a cause of action accrues may bring the action two years after the disability is removed. Presumably, a statute of limitations would be tolled indefinitely for persons under permanent mental impairment such as Jeffrey. His action would have been timely under this general tolling statute since this action was filed prior to his eighteenth birthday and prior to the removal of his legal disability due to mental impairment. The parties agree that, if constitutional, the medical malpractice statute, rather than the gener-

---

**1.** The majority of federal courts reviewing similar malpractice statutes have also held them constitutional. See, *e.g., Gronne v. Abrams,* 793 F.2d 74 (2d Cir.1986); *Montagino v. Canale,* 792 F.2d 554 (5th Cir.1986); *Hoffman v. United States,* 767 F.2d 1431 (9th Cir.1985); *Brubaker v. Cavanaugh,* 741 F.2d 318 (10th Cir.1984); *Jewson v. Mayo Clinic,* 691 F.2d 405 (8th Cir.1982); and *DiAntonio v. Northampton–Accomack Memorial Hospital,* 628 F.2d 287 (4th Cir.1980). But, see, *Coburn v. Agustin,* 627 F.Supp. 983 (D.Kan.1985); *Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825 (1980); *Sax v. Votteler,* 648 S.W.2d 661 (Tex.1983); *Barrio v. San Manuel Civ. Hosp. Magma Cooper Co.,* 143 Ariz. 101, 692 P.2d 280 (1984); *Strahler v. St. Luke's Hospital,* 706 S.W.2d 7 (Mo.1986).

**2.** To be covered by the Act, a health care provider must:
(1) cause to be filed with the commissioner proof of financial responsibility as provided by section 6 of this chapter; and
(2) pay the surcharge assessed by this article on all health care providers according to chapter 4 of this article.
Ind.Code § 16–9.5–2–1 (1976).

**3.** Section 16–9.5–3–1 provides in full:

No claim, whether in contract or tort, may be brought against a health care provider based upon professional services or health care rendered or which should have been rendered unless filed within two (2) years from the date of the alleged act, omission or neglect except that a minor under the full age of six (6) years shall have until his eighth birthday in which to file. This section applies to all persons regardless of minority or other legal disability.

**4.** Indiana qualifies persons under the age of eighteen years, of unsound mind, or absent from the United States as being under legal disability. Ind.Code § 34–1–67–1(6) (1976). "Unsound mind" is defined to include "idiots, noncompotes (non compos mentis), lunatics and distracted persons." Ind.Code § 34–1–67–1(3) (1976). "[T]he relevant proof is whether the person claiming the benefit of the extensions statute is incapable of either understanding the rights that he would otherwise be bound to know, or of managing his affairs with respect to the institution and maintenance of a claim for relief." *Collins v. Dunifon,* 163 Ind. App. 201, 323 N.E.2d 264, 269 (1975).

al tolling statute, applies to bar plaintiffs' action. See *Johnson*, 404 N.E.2d at 603.

Plaintiffs argue that the malpractice statute of limitations violates the equal protection clause of the Fourteenth Amendment, suggesting that minors who will never be free of their legal disability, such as Jeffrey, should be treated as a suspect class warranting strict scrutiny, or at a minimum, as a quasi-suspect class requiring heightened scrutiny. Plaintiffs additionally assert that the statute violates Jeffrey's guarantee of due process by denying him a meaningful opportunity to adjudicate his claim.[5]

## II. Equal Protection Attack

Plaintiffs assert that the statute of limitations contained in the Act creates an express classification based on age and legal disability due to mental impairment. This statutory classification is revealed by contrasting the general tolling statute of limitations with the more limited malpractice tolling period. The general tolling statute contained in Section 34-1-2-5 creates an equitable exception to the general rule that the limitations period commences upon the accrual of the cause of action. For plaintiffs under a legal disability who fail to commence the action within the applicable limitations period, the statute provides two additional years from removal of the disability in which to commence their action. The general tolling statute recognizes the unlikelihood that persons under the age of majority, of unsound mind or absent from the country will be capable of commencing an action until the disability is removed.

The malpractice statute of limitations treats plaintiffs with legal disabilities less favorably than under the general tolling statute by reducing the age of majority to six years and removing the indefinite tolling provision contained in the general statute of limitations for other legal disabilities. Specifically, plaintiffs ask this Court to examine the Act's treatment of the class containing minor plaintiffs such as Jeffrey whose disabilities due to mental impairment will not be removed upon reaching majority and conclude this violates the equal protection clause.

■ The success of plaintiffs' equal protection challenge to the malpractice statute of limitations turns on the level of scrutiny applied to the statutory classification. Economic or social legislation which does not involve suspect classifications or infringe on a fundamental interest is presumed constitutional and will be upheld if it is rationally related to a legitimate state interest. *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976). It is a rare statute, indeed, which cannot withstand the minimal rational relationship analysis. But see, *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

■ Plaintiffs have chosen an uphill battle in trying to persuade this Court that persons legally disabled because of minority and mental incapacity are a suspect classification. As support for this unprecedented proposition, plaintiffs attempt to characterize this class broadly as a "discrete and insular minority," *United States v. Carolene Products Co.*, 304 U.S. 144, 153 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938), which is "saddled with such disabilities ... as to command extraordinary protection from the majoritarian political process." *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973). To bolster their use of this all-encompassing language, plaintiffs can point this Court to no case which has recognized either minors or persons of unsound mind as a suspect classification. Further, many groups are capable of fitting within the vagaries of a discrete and insular minority, but few have suffered the history of discrimination characteristic of the suspect classifications of race and national origin.

5. On appeal, plaintiffs apparently have abandoned their argument which was rejected by the district court that the limitations period should be tolled because plaintiffs' cause of action was fraudulently concealed from them by Dr. Stallings.

■ As an alternative to application of strict scrutiny, plaintiffs argue that the statutory classification of mentally incompetent minors requires heightened scrutiny similar to that applied to gender classifications. Such a quasi-suspect classification will fail unless it is substantially related to a sufficiently important governmental interest. *Mississippi University for Women v. Hogan,* 458 U.S. 718, 725, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982). In support of their argument that heightened scrutiny is warranted, plaintiffs attempt to analogize the classification at issue to that of illegitimate children, who have been recognized by the Supreme Court as a quasi-suspect group warranting heightened scrutiny.

> In view of the history of treating illegitimate children less favorably than legitimate ones, we have subjected statutory classifications based on illegitimacy to a heightened level of scrutiny.... "[A] classification based on illegitimacy is unconstitutional unless it bears 'an evident and substantial relation to the particular ... interests [the] statute is designed to serve.'"

*Pickett v. Brown,* 462 U.S. 1, 8, 103 S.Ct. 2199, 2204, 76 L.Ed.2d 372 (1983).

Although mentally handicapped minors have no doubt endured discrimination and prejudice by unenlightened members of society, they have not suffered a history of such discrimination at the hands of legislatures as have illegitimate children. Indeed, legislatures have often granted special treatment to the mentally retarded in order to accommodate their unique educational needs. *Cleburne,* 473 U.S. at 443, 105 S.Ct. at 3256. Therefore, the rationale for extending a more heightened scrutiny to a classification of mentally handicapped persons is lacking.

Any doubt regarding whether mentally handicapped individuals should be treated as a suspect classification has been resolved by the Supreme Court's specific refusal to extend either strict or heightened review to classifications involving the mentally retarded. "Because mental retardation is a characteristic that the government may legitimately take into account in a wide range of decisions, and because both State and Federal Governments have recently committed themselves to assisting the retarded, we will not presume that any given legislative action, even one that disadvantages retarded individuals, is rooted in considerations that the Constitution will not tolerate.... To withstand equal protection review, legislation that distinguishes between the mentally retarded and others must be rationally related to a legitimate governmental purpose." *Cleburne,* 473 U.S. at 446, 105 S.Ct. at 3257.

Likewise, statutes which classify on the basis of age are subject only to the minimal rational relationship review. "While the treatment of the aged in this Nation has not been wholly free of discrimination, such persons, unlike, say, those who have been discriminated against on the basis of race or national origin, have not experienced a 'history of purposeful unequal treatment' or been subjected to unique disabilities on the basis of stereo-typed characteristics not truly indicative of their abilities." *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976). Although the classification contained in the malpractice statute of limitations disadvantages minors rather than the elderly as in *Murgia,* the reasoning behind the Supreme Court's refusal to extend heightened scrutiny to classifications of the aged applies equally to this statute disadvantaging minors; *i.e.,* when the characteristics of a statutory classification are relevant to the legitimate interests of the State, the judiciary need not closely scrutinize the legislation in question. It is because race and national origin are "so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy.... For these reasons and because such discrimination is unlikely to be soon rectified by legislative means, these laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest." *Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254. Legislative classification based on youth, however, is clear-

ly relevant to the state's *parens patriae* responsibilities toward minors.

The challenged statutory classification of minor children with permanent legal disabilities due to diminished mental capacity implicates the intersection of two characteristics, which individually warrant only rational relationship review. The concurrence of these two characteristics does not change the Supreme Court's directive that age and mental incapacity are often relevant statutory classifications which need only be rationally related to a legitimate state interest.

As a final resort, plaintiffs assert that the rational relationship test requires a more exacting inquiry here than a rational relationship between the class and a legitimate state interest, relying on *Cleburne* and *Metropolitan Life Insurance Co. v. Ward,* 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985). In *Cleburne,* although the Court declined to extend strict or heightened review to classifications based on mental impairment, plaintiffs assert that the Court engaged in a stricter review than the traditional rational relationship analysis, by examining the "closeness of the fit between legislative goals and means." (Pl.Br. at 17.) Under this purportedly stricter emerging rational relationship test, plaintiffs assert the malpractice statute of limitations cannot be sustained.

The city of Cleburne required a special use permit for the operation of a group home for the mentally retarded. Because they were not considered to be related to the ordinance the Court rejected the city's proffered justifications, which included the neighboring property owners' fear of the residents of the home, location of the home near a junior high school where students may be prone to harassing the mentally retarded, location of the home on a 500–year flood plain, density regulations, and lessening of traffic congestion. Since there was no rational relationship between these goals and the classification, the Court concluded that the ordinance was premised on sheer prejudice against the mentally retarded. "[R]equiring the permit in this case appears to us to rest on an irrational prejudice against the mentally retarded...." *Cleburne,* 473 U.S. at 450, 105 S.Ct. at 3259.

In *Metropolitan,* the Court held unconstitutional an Alabama statute which required foreign insurance companies to pay a 4% tax on the premiums from policies sold in-state while insurance companies located in Alabama were required to pay a comparable tax of 1%. The legislative goals of the tax were encouragement of capital investment in Alabama and fostering the growth of the state insurance industry. The Court characterized these goals of the legislation as "the very sort of parochial discrimination that the Equal Protection Clause was intended to prevent." *Metropolitan,* 470 U.S. at 878, 105 S.Ct. at 1681.

Thus in both *Cleburne* and *Metropolitan,* the Court found that the purpose of each legislation in question was discrimination itself. By definition, a statutory classification distinguishing between, for example, domestic and foreign insurance companies will be rationally related to a goal of discrimination against foreign insurance. Therefore, the statutes in *Ward* and *Cleburne* were held unconstitutional not because the Court was applying a heightened form of scrutiny, but because the proffered goals were not legitimate state interests. Viewed in this light, *Cleburne* and *Ward* do not represent a deviation from the traditional rational relationship analysis. With the foregoing principles in mind, we examine the statute of limitations contained in the Act for a rational relationship between the classification of minors with permanent mental handicaps and the goals of the Act.

■ The Indiana Act was passed in 1975 to address the concerns of rising medical costs and the need for comprehensive, affordable health coverage. Repercussions of the medical crisis which spurred the Act were depicted by the Indiana Supreme Court in *Johnson:*

> Immediately prior to its enactment seven of the ten insurance companies writing the majority of medical malpractice insurance policies in the State ceased or limited writing such insurance because of

unprofitability or an inability to calculate an adequate premium. Premiums had already increased as much as 1200 percent over a period of fifteen years because of the increase in the number and size of claims.

*Johnson,* 404 N.E.2d at 589. The Act sought to control the escalation of malpractice awards and concomitant increase in insurance premiums and health care costs by modifying the procedural rules for litigation.

As one of the modifications, the Act established the previously discussed specific statute of limitations. In general, statutes of limitations provide a desired order and finality to the litigious process by way of an albeit arbitrary, but bright line.

Statutes of limitation find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles. They are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost. They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay. They come into the law not through the judicial process but through legislation. They represent a public policy about the privilege to litigate.

*Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945). See also *G.D. Searle & Co. v. Cohn,* 455 U.S. 404, 102 S.Ct. 1137, 71 L.Ed.2d 250 (1982).

In addition to addressing the concerns of stale claims and loss of evidence over time common to all litigation, this modified statute of limitations reflects the relatively greater need for a shorter period in which malpractice claims could be commenced. The statute of limitations establishes a shorter period of limitations by reducing the age of majority to six years, beginning the limitations period with the occurrence of the injury rather than its discovery, and abandoning the tolling period for unsound mind and absence from the country.

Plaintiffs argue that suspending the tolling period for the statute of limitations for claims against health care providers by minors, such as Jeffrey, who will never be emancipated from legal disability is not rationally related to the legislative goal of health care cost containment. They assert that the cause of the malpractice crisis is the greater incidence of malpractice by health care providers such that the Act operates as a windfall to health care providers at the expense of patients victimized by malpractice.

By presenting such an argument, plaintiffs ask this Court to engage in the very sort of balancing of interests which is the domain of the legislature. The rational relationship test reflects this separation of powers by requiring only that the legislative goal be a legitimate state interest and bear some rational nexus to the statutory classification, rather than requiring the court to reach the same balance of interests. Plaintiffs' argument, therefore, cannot be accepted.

Creating a shorter period of limitations in which to commence actions against health care providers is clearly a rational legislative response to the fiscal uncertainties in the health care industry. The ability to commence an action at an indefinite time in the future would no doubt prevent insurance companies from accurately computing the actuarial risk of future claims and compound the escalation of medical costs. Although the Act does contain a $500,000 cap per injury which serves to limit liability for each incident, the statute of limitations serves to limit the number of potential claims outstanding.

The limitations statute allows a minor until his eighth birthday to bring an action against a health care provider for an injury occurring prior to the child's sixth birthday. The age of six was presumably chosen as being that age by which a child is capable of communicating to the parents or guardian the existence and extent of any pain or injury. *Johnson,* 404 N.E.2d at 604. Although Jeffrey was unable to so inform his

parents, his injury was readily apparent to them. The statute allowed his parents nine years [6] in which to discover the cause of Jeffrey's injuries and seek their redress. While not unsympathetic to the plight of Jeffrey and his parents, we are compelled to find that the limits imposed by the malpractice statute of limitations are certainly rationally related to the stated goals of preventing stale claims and controlling the cost of medical care.

## III. Due Process Attack

■ Plaintiffs offer the alternative argument that the malpractice statute of limitations impinges on the plaintiffs' fundamental right of meaningful access to the courts in violation of the due process clause of the Fourteenth Amendment requiring the statute to pass "strict scrutiny" under which the state must show a compelling governmental interest.[7] By suspending the generally applicable tolling period, plaintiffs contend that the Act eviscerates their opportunity for adjudication of this claim against the defendants. Further, plaintiffs argue that application of the occurrence rule which ties the running of the limitations period to the occurrence of the act or omission causing the injury denies them access to court before they are aware of the existence of a cause of action.

Plaintiffs assume as a premise of their argument that due process requires the state to toll the statute of limitations for persons with legal disabilities such as minority or mental handicap. It is worth noting that medical malpractice is not the only area where the state legislature has

chosen to modify the general tolling provision. A similar limit on the general tolling statute is placed on product liability actions which are subject to the limitation "regardless of minority or legal disability." [8] This statute has been upheld by this Court against equal protection and due process challenges. "The effect of this [statute] is to lessen the risk of loss—i.e., from having to pay injuries resulting from use of a defective product—manufacturers face when they place a product into a stream of commerce. That is a legitimate legislative purpose, and it is not the courts' business to instruct the Indiana legislature when it is better for consumers than producers to bear that risk." *Braswell v. Flintkote Mines, Ltd.,* 723 F.2d 527, 531 (7th Cir. 1983), certiorari denied, 467 U.S. 1231, 104 S.Ct. 2690, 81 L.Ed.2d 884 (1984), quoting *Pitts v. Unarco Industries, Inc.,* 712 F.2d 276, 280 (7th Cir.1983), certiorari denied, 464 U.S. 1003, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983).

Plaintiffs contend that due process requires an indefinite length of time in which to access the courts for the purpose of adjudicating malpractice claims as allowed by the general tolling statute prior to the malpractice statute of limitations. However, a tolling statute, like any procedural rule, cannot vest plaintiffs with a substantive right in the continued protection of that rule.

[Statutes of limitation] represent a public policy about the privilege to litigate. Their shelter has never been regarded as what now is called a 'fundamental' right or what used to be called a 'natural' right

---

**6.** Plaintiffs had two years from the effective date of the act, July 1, 1975, to commence this action, at which time Jeffrey was nine years old.

**7.** Plaintiffs also assert that the statute of limitations violates the open courts provision of the Indiana Constitution which states that "[a]ll courts shall be open; and every man for injury done to him in his person, property, or reputation, shall have remedy by due process of law." Article I, § 12, Indiana Constitution. This provision, however, imposes no further restriction than already contained in the due process clause. *Scalf v. Berkel,* 448 N.E.2d 1201 (Ind.Ct. App.1983).

**8.** ... This section applies to all persons regardless of minority or legal disability. Notwithstanding IC 34–1–2–5, any product liability action must be commenced within two (2) years after the cause of action accrues or within ten (10) years after the delivery of the product to the initial user or consumer; except that, if the cause of action accrues more than eight (8) years but not more than ten (10) years after that initial delivery, the action may be commenced at any time within two (2) years after the cause of action accrues. Ind.Code § 33–1–1.5–5 (1988).

of the individual. He may, of course, have the protection of the policy while it exists, but the history of pleas of limitation show them to be good only by legislative grace and to be subject to a relatively large degree of legislative control. *Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 1142.

Due process in the modification of procedural rules is provided by the legislative process itself, subject to a minimal requirement of rationality. "[I]t remains true that the state's interest in fashioning its own rules of tort law is paramount to any discernible federal interest except perhaps an interest in protecting the individual citizen from state action that is wholly arbitrary or irrational." *Martinez v. California,* 444 U.S. 277, 282, 100 S.Ct. 553, 557, 62 L.Ed.2d 481 (1980).

As discussed *supra,* the malpractice statute of limitations is clearly rationally related to its goal of relieving the malpractice insurance crisis. It is the province of the Indiana legislature to allocate the increased cost of health care between the health care providers, insurance carriers and patients and to determine under what circumstances it is appropriate to delay the running of the statute of limitations in spite of the increased risk of lost evidence and lapse of memory. The state need not provide a tolling provision for minority and mental incompetence or a discovery rule in order to comply with the due process guarantees of a meaningful opportunity to be heard.

For the foregoing reasons the judgment of the district court is affirmed.